UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-CR-80208-CANNON

UNITED STATES OF AMERICA,

Plaintiff,

vs.

KENNETH BROWN, III,

Defendant.
_______________________________________/

**DEFENDANT'S MOTION FOR DOWNWARD VARIANCE AND SENTENCING MEMORANDUM**

Kenneth Brown was just 21 years old and on the autism spectrum when federal agents arrested him for distributing child pornography online. He was living at home with his mother and younger siblings, had just started working as a parking attendant at the Kravis Center, and had never been arrested before. Despite his youth, autism, employment, supportive family, and lack of criminal history, he faces a mandatory minimum five years in prison and a guideline range that recommends a sentence at or near the statutory maximum of 20 years. He now asks this Court consider a significant downward variance.

A. **This Court should consider the "mitigating qualities of youth" in deciding an appropriate sentence in this case.**[1]

> Youth is more than a chronological fact. It is a time of immaturity, irresponsibility, impetuousness, and recklessness. It is a moment and

[1] *Johnson v. Texas*, 509 U.S. 350, 367 (1993).

> condition of life when a person may be most susceptible to influence and to psychological damage. And its signature qualities are all transient.

*Miller v. Alabama*, 567 U.S. 460, 476 (2012) (internal citations and quotation marks omitted).

The Supreme Court has long recognized that youthful offenders are different from adults for sentencing purposes. *Miller v. Alabama*, 567 U.S. 460, 471 (2012). Their "diminished culpability and greater prospects for reform" make them "less deserving of the most severe punishments." *Id.* (quoting *Graham v. Florida*, 560 U.S. 48, 68 (2010). They lack maturity and have "an underdeveloped sense of responsibility" that leads to "recklessness, impulsivity, and heedless risk taking." *Roper v. Simmons*, 543 U.S. 551, 569 (2005). They are "more vulnerable … to negative influences and outside pressures" with "limited control over their own environment." *Miller*, 567 U.S. at 471 (*quoting Roper*, 543 U.S. at 569). And their character is not "well-formed" or "fixed," making their actions "less likely to be evidence of irretrievable depravity." *Id.* (internal quotation marks omitted). These differences "render suspect any conclusion that a juvenile falls among the worst offenders." *Roper*, 543 U.S. at 570.

The high court's decisions invalidating sentences of death (*Roper*), life without parole for homicide offenses (*Graham*), and life without parole for non-homicide offenses (*Miller*) rested "not only on common sense – on what 'any parents knows' – but on science and social science as well." *Miller*, 567 U.S. at 471. Those "fundamental differences between juvenile and adult minds" like the "transient rashness, proclivity for risk, and inability to assess consequences – both lessened a child's 'moral

culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his deficiencies will be reformed." *Id*. at 472.

Moreover, these differences in youthful minds "diminish the penological justifications for imposing the harshest sentences." *Id*. at 472. Because minors are not as blameworthy, the case for retribution is not as strong. *Id*. Because they are immature, reckless, and impetuous, they are less likely to consider potential punishment, lessening the argument for deterrence. *Id*. at 472-73. Because incorrigibility is inconsistent with youth, the argument for incapacitation and rehabilitation does not justify a maximum sentence. *Id*. at 473. And though *Roper*, *Graham*, and *Miller* addressed sentences of life and death for juveniles, none of what those cases – or the science they cited – "said about children – about their distinctive (and transitory) mental traits and environmental vulnerabilities – is crime-specific." *Id*.

To be certain, Kenneth is no longer legally a juvenile – he is 21 years old. But "the qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Roper*, 543 U.S. at 574. The American Academy of Pediatrics has generally defined adolescence through age 21, but it has also found that demarcation line "arbitrary" because of the "increasing evidence that brain development has not reliably reached adult levels of functioning until well into the third decade of life." American Academy of Pediatrics. Policy Statement: Age Limit of Pediatrics. Pediatrics (journal). Vol. 140, Issue 3, Sept. 2017, available at

https://publications.aap.org/pediatrics/article/140/3/e20172151/38333/Age-Limit-of-Pediatrics.

Brain science recognizes that young people "(1) tend to be more strongly motivated by the possibility of reward than adults; (2) have greater difficulty controlling their impulses; and (3) have greater difficulty recognizing and regulating emotional responses" and that these attributes continue to develop through early adulthood. Brief for the American Medical Association and American Academy of Child and Adolescent Psychiatry as Amici Curiae in Support of Neither Party, *Miller*, 567 U.S. 460, 2012 WL 121237, 7-11.

Brain imaging techniques reflect the biological basis for these differences evolving well into late adolescence, highlighting differences in the physical structure of the brain, its makeup, and its ways of processing input. *Id*. at 13-30; *see also*, Center for Law, Brain & Behavior at Massachusetts General Hospital, *White Paper on the Science of Late Adolescence: A Guide for Judges, Attorneys and Policy Makers* 2 (2022) available at https://clbb.mgh.harvard.edu/wp-content/uploads/CLBB-White-Paper-on-the-Science-of-Late-Adolescence-3.pdf (hereinafter "White Paper").

And, while late adolescents take more risks, engage in more sensation-seeking behavior, and are more likely than young adults to respond to immediate outcomes and less likely to delay gratification, most "will not continue to offend through their twenties, thirties and beyond." *White Paper* at 2. Science shows the behavioral qualities of adolescents reflect their incomplete "sense of self" - one significantly influenced by their maturity and surrounding social environment. Brief for the

American Psychological Association et. al. as Amicus Curiae in Support of Petitioners, *Miller*, 567 U.S. 460, 2012 WL 174239, 19. This process of identity change "typically remains incomplete until at least the early twenties" when a more permanent personality becomes established. *Id.* at 19-20. Poor decision-making and antisocial behaviors are ones many outgrow with time. *Id.* at 21.

Thus, while the Sentencing Guidelines recommend a sentence at or near the statutory maximum, such punishment should be reserved only for the worst distribution offenders. Kenneth's youth alone "render[s] suspect any conclusion that [he] falls among the worst offenders." *Roper*, 543 U.S. at 570. It made him more susceptible "to immature and irresponsible behavior," suggests his conduct was "not as morally reprehensible as that of an [older] adult," and evinces a high likelihood he will reform. *Id.* This Court should consider his youth as mitigation and sentence him accordingly.

**B. This Court should also consider Kenneth's recent autism diagnosis as mitigating.**

The signs were there from a young age, but no one recognized Kenneth's autism spectrum disorder. He did not speak until he was five years old and was always very quiet, with few friends, his mother recalls. He always had difficulty interpreting emotional reactions like anger or humor; he became fixated on collecting various things like Pokeman cards and Legos; and he would become unreasonably frustrated with unexpected changes to his daily routine. He never achieved basics that most of us take for granted like learning how to drive, ride a bike, or tie his shoes.

Dr. Michael Brannon, a forensic psychologist with over 35 years of experience,[2] diagnosed Kenneth with autism.[3] Autism is a neurodevelopmental condition whereby an individual has difficulties with social communication and interaction and engages in restricted, repetitive patterns of behavior, interests, or activities. Autism can make it difficult for someone like Kenneth to learn and apply age-appropriate sexual knowledge or understand concepts and legal implications about sexuality and sexual material he finds online. Autism could also explain repetitive collection behavior regardless of any actual sexual interest in minors.

Kenneth's autism diagnosis does not excuse his offense behavior. The argument here is not that every person on the autism spectrum distributes or possesses child sexual abuse material. Rather, his undiagnosed and untreated autism, particularly when coupled with his youth, does help to explain his behavior and should mitigate his punishment.

**C. This Court can reasonably protect the public without sentencing Kenneth to 20 years in prison.**

The Adam Walsh Act permits the government to seek continued detention at the end of a sexual offender's prison sentence if it believes he remains sexually dangerous at that time. 18 U.S.C. § 4248. Thus, this Court need not decide today whether 20 years is necessary to protect society from Kenneth in the future. It can wait to see what impact a shorter prison sentence has on him before deciding whether

---

[2] Dr. Brannon's Curriculum Vitae is attached as Exhibit A.
[3] Dr. Brannon's Report will be attached as Exhibit B, pending leave of this Court to file under seal.

he is too dangerous to release. His lack of criminal history or any substance abuse concerns suggest he could easily learn from that experience.

Moreover, the Court can order a lengthy period of supervised release, allowing probation to monitor Kenneth's behavior with the constant threat of additional incarceration if he fails to comply. At the same time, federal law and all state laws require him to register as a sexual offender upon his release from prison for the rest of his life. As such, any community in which he chooses to live will be aware of any remaining danger he may present, and law enforcement can monitor him accordingly. Simply stated, this Court does not need to incarcerate Kenneth for 20 years to protect society from him.

**D. Kenneth's crime, which included many commonplace characteristics, should not be punished as severely as the worst offenders – and section 2G2.2 fails to distinguish between the two.**

Through the sentencing guidelines, Congress sought "proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity." U.S.S.G. § 1A1.3. Yet, the Sentencing Commission has repeatedly found section 2G2.2 fails to achieve this goal because its specific offense characteristics apply in most cases. United States Sentencing Commission, *Report to Congress: Federal Sentencing of Child Pornography: Non-Production Offenses* 19 (June 2021) ("2021 Report"); United States Sentencing Commission, *Report to Congress: Federal Child Pornography Offenses* ii-iii (December 2012) ("2012 Report").

Kenneth's case illustrates the point. Here, probation assessed two levels because the materials he distributed involved prepubescent minors, four levels because they involved either infants, toddlers, violence, or sadistic/ masochistic behavior, two levels because he used a computer, and five levels because his offense involved more than 600 images. But the Commission has found these same enhancements apply in 96.8%, 89.6%, 95.4%, and 97% of distribution cases, respectively. 2021 Report at 19. As such, these enhancements fail to distinguish between the least and worst child pornography offenders.

Yet, they matter. With these 13 levels of enhancements, Kenneth's total offense level is 38, resulting in an advisory sentence of 235-240 months, despite having no criminal history whatsoever. Without them, his guideline range would be just 57-71 months. This kind of absurd result demonstrates why district judges impose below-guideline sentences in almost 75% of distribution cases. 2021 Report at 23; *See United States v. Beiermann*, 599 F. Supp. 2d 1087, 1105-08 (N.D. Iowa 2009) (rejecting section 2G2.2 on policy grounds and providing an alternative guideline calculation).

**E. Conclusion**

Kenneth does not seek to diminish the harm he caused by distributing child pornography online. He has accepted responsibility for that behavior. But Kenneth is not a hardened criminal or a repeat offender – he has no criminal history. He is a 21-year-old kid with a neurodivergent brain who never learned to drive a car, ride a bike, or tie his shoelaces. While he knows his sentence must reflect just punishment for his

offense, he hopes it will also reflect his personal history and characteristics. Kenneth is more than the crime he committed.

WHEREFORE Defendant respectfully requests the Court to grant the above-styled motion.

Respectfully submitted,

HECTOR DOPICO
FEDERAL PUBLIC DEFENDER

s/ *Scott Berry*
Scott Berry
Assistant Federal Public Defender
Attorney for the Defendant
Florida Bar No. 0525561
250 South Australian Avenue, Suite 400
West Palm Beach, Florida 33401
(561) 833-6288 - Telephone
Scott_Berry@FD.org

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*s/ Scott Berry*
Scott Berry